IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| GARY WADDOUPS, as Personal Representative for The Estate of H. Marr Waddoups, | ) ) ) ) | No. 33257-8-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| NATIONWIDE LIFE INSURANCE COMPANY, an Ohio Corporation, FINANCIAL MANAGEMENT, INC., a Washington Corporation, and CLARK L. PERMANN and JANE DOE PERMANN, husband and wife, | ) ) ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, J. — We apply established principles in an area of law untouched by Washington appellate courts—the duty of a financial planner when selling an annuity. Gary Waddoups claims financial planner Clark Permann violated fiduciary duties when Permann sold an annuity and allegedly failed to warn Gary's father, Marr Waddoups, that the annuity lacked a death benefit. In short, Gary Waddoups claims Permann sold an unsuitable annuity. Marr Waddoups was eighty-five-years-old and in poor health at the

time of sale. Gary Waddoups appeals from a summary judgment order dismissing his claims with prejudice. We reverse the summary dismissal. In addition to addressing the merits of the suit, the appealed issues require a review of standing, waiver of the dead man statute, limitations to expert testimony, and summary judgment motion rules.

## FACTS

Appellant Gary Waddoups is the son of H. Marr Waddoups. He sues as the personal representative of the Estate of Marr Waddoups. The subject of the lawsuit is a Nationwide Life Insurance Company single premium immediate annuity policy sold by respondent Clark Permann to Marr Waddoups. "Single premium" means the annuitant pays one large premium at the onset of the annuity. "Immediate" means annuity payments begin almost immediately. Nationwide and Clark Permann's company, Financial Management, Inc. are also respondents. The respondents present the same evidence and forward the identical summary judgment arguments.

The trial court granted all respondents dismissal of the case on summary judgment. Since Gary Waddoups was the nonmoving party, we focus on his version of the facts in our later analysis. Nevertheless, in this factual section, we also outline the defense version of the facts.

Marr Waddoups was a successful agronomist for nearly sixty years in the lower Columbia Basin. He earned a master's degree in agronomy from Utah State University. After working for various companies in the 1960s, he opened and operated his own

2

agriculture consulting services firm. He fathered four children from his first marriage that ended in 1978 and three stepchildren from his second marriage to Elizabeth Waddoups.

In October 2003, Elizabeth Waddoups showed signs of dementia. In 2004, Elizabeth suffered a seizure and in 2005 her cognitive abilities markedly declined. From at least February 2005 until his death in 2011, Marr Waddoups suffered from diabetes, vasculitis-arteriosclerosis obliterans, and peripheral vascular disease. Arteriosclerosis involves the deposition of cholesterol plaques and other material on the inside of artery walls. Arteriosclerosis obliterans results in the narrowing and gradual blockage of the artery. Peripheral vascular disease entails the narrowing of arteries other than those that supply the heart and brain with blood. In July 2007, Marr Waddoups experienced chronic renal failure. Beginning in 2008, Waddoups suffered from weakness and a loss of muscle tone. He encountered difficulty walking.

Clark Permann works as a credentialed financial planner and registered investment advisor. Through the company, Financial Management, Inc., Permann provided financial advice to clients in the Tri-Cities. On Financial Management's website, the company advertised that a "**credentialed planner** is important because they are bound by a '**Code of Ethics**' to do what's in the best interest of the client." Clerk's Papers (CP) at 579. The website also declared that a registered investment advisor:

3

> means that they [sic] are registered with their [sic] state or the Securities Exchange Commission (SEC), and can legally call themselves a **financial planner,** as well as they [sic] are treated as a **fiduciary,** and must give you advice that is in your best interest[,] not just **sell you a suitable product.**

CP at 580.

Beginning in April 2008, Clark Permann assisted Marr Waddoups with financial planning. Between April 30 and December 24, 2008, Permann met with Waddoups several times to discuss his objectives and needs based on his personal and family circumstances.

Clark Permann testified by declaration that, in December 2008, Marr Waddoups met with Permann to discuss purchasing an annuity. Waddoups brought to the meeting a quote through New York Life for a life-only annuity with a $100,000 premium that paid $1,500 in monthly income. The quoted policy contained no death benefit. Waddoups told Permann, in that meeting, that he wanted an investment that provided a guaranteed fixed income for the rest of his life to supplement his substantial variable income from stocks and bonds he already owned. The 2008 economic downturn impacted his income from the other investments. According to Permann, single life only annuities offer the highest monthly payout, a feature desired by Waddoups.

Clark Permann testified in his declaration that he procured, at Marr Waddoups' request, a single life annuity offered by Nationwide Life Insurance Company, which provided higher monthly payments than the New York Life annuity. This statement must

4

be challenged since the Nationwide policy only paid $1,417.43 per month and Permann testified the New York Life would pay $1,500.00 per month. Regardless, Permann insists he explained to Waddoups that the annuity provided no death benefit and he elucidated the advantages and disadvantages of the annuity. According to Permann, Waddoups concluded that the Nationwide single premium immediate annuity fit his needs and Waddoups decided to purchase the annuity.

All single premium immediate annuities provide an annual, semiannual, quarterly, or monthly income for a specified period or for life. Some single premium immediate annuities provide an income stream for a specified period of time regardless of whether the annuitant survives that period. If the annuitant does not survive the period, the insurance company pays the income stream to the annuity's beneficiary for the remainder of the specified period. Other single premium immediate annuities, often called "life-only" annuities, pay only during the life of the annuitant. Insurance companies also issue single life and joint life annuities and various combinations of life-only and specific period annuities, whereby a nominal amount is paid to the beneficiary upon the death of the annuitant rather than a continuing income stream.

Clark Permann averred in his declaration that, when Marr Waddoups purchased the annuity, "he was cogent and knowledgeable of his health, his overall financial situation, and the specific investment he was making." CP at 674. Waddoups informed Permann that he had diabetes, but Waddoups expressed no concern that diabetes would

5

shorten his life. Permann does not identify any other ailments, from which Waddoups suffered, about which he knew. According to Permann, Waddoups told him on a number of occasions that he believed he would live another ten years. Permann testified:

> Mr. Waddoups decided that the investment was suitable and expressed an unequivocal desire to purchase the Annuity whether it was through me or another representative. It was clear to me, and Mr. Waddoups verbally expressed to me, that he understood the nature of the purchase he was making and the fact that the Annuity would result in his receiving $1,418.00 per month for the rest of his life and that neither he nor his beneficiaries would receive anything upon his death.

CP at 674.

Marr Waddoups does not live to dispute the testimony of Clark Permann concerning the conversations between the two. Gary Waddoups denies that Permann warned his father of the lack of a death benefit in the Nationwide annuity and denies that his father made comments to Permann about living another ten years. Gary lacks any direct evidence to contradict Permann's testimony, however.

On December 18, 2008, Marr Waddoups completed an application to purchase a single premium immediate annuity from Nationwide. The annuity required payment of a $100,000 premium and paid $1,417.43 in monthly income beginning January 17, 2009. The application form included a space for the applicant to designate a beneficiary. Marr Waddoups designated his wife, Elizabeth Waddoups, as the primary and sole beneficiary of the annuity. The application did not mention that the annuity required no beneficiary because the annuity afforded no death benefit.

On February 24, 2009, Clark Permann completed and signed a Crump Suitability Form for Fixed Annuities where he stated:

> I acknowledge that I have made a reasonable effort to obtain information from the Owner concerning the Owner(s)' financial status, tax status, investment objectives and other information considered reasonable. It is my belief that based on: 1) The information the Owner provided, 2) All the circumstances known to me at the time the recommendation was made, the annuity being applied for, based on my recommendation is suitable for the Owner(s)' insurance needs and/or financial objectives.

CP at 729. The form listed Marr Waddoups' worth as exceeding $3 million.

On December 20, 2008, Marr Waddoups paid the $100,000 premium for the Nationwide single premium immediate annuity policy #01-6062588 with a check written on the account of the Waddoups Living Trust, of which Elizabeth Waddoups and he were trustees. Despite the check being issued by the trust, the annuity application designated Marr Waddoups as the owner of the annuity. Marr Waddoups, as trustor of the Waddoups Living Trust, retained the right, during his lifetime, to remove trust property for investments and other purposes.

Marr Waddoups was eighty-five-years-old when he purchased the annuity. The Social Security Administration's Period Life Table 2009 listed the life expectancy of an eighty-five-year-old male of average health to be 5.8 years. To recoup the $100,000 premium, without interest, Waddoups needed to collect the annuity income for 5.88 years.

7

According to Clark Permann, when Marr Waddoups purchased the Nationwide single premium immediate annuity, he received a Supplementary Agreement to Individual Annuity Contract. Permann did not testify as to when or from whom Waddoups received the agreement. Permann did not disclose in his declaration the basis on which he knows the Waddoups received the agreement. The agreement states, in part:

> You have selected an annuity for a Straight Life under which Monthly payments will be made during the guaranteed period. There is no death benefit payable under this option. Upon your death, payments will stop.

CP at 676.

On February 3, 2009, more than one month after purchase of the annuity, Marr Waddoups received a copy of the Nationwide annuity contract. "Contract Information" is one of the opening pages of the annuity contract. CP at 684. That page listed Marr Waddoups as the owner and annuitant and designated the income option elected as "single life." CP at 684. The page also listed Elizabeth Waddoups as the beneficiary.

The Nationwide single premium immediate annuity purchased by Marr Waddoups contained the following definitions:

> **Annuitant**—The person upon whose continuation of life any lifetime annuity payment depends. The Annuitant is the recipient of annuity payments.
> **Beneficiary**—The person designated to receive certain benefits under the Contract upon the later death of the Annuitant or the Joint Annuitant, if any, as applicable.
> . . . .

8

**Income Start Date**—The date the Company calculates the schedule of income payments and begins processing necessary to initiate income payments. The date payments are actually received will vary, but generally is within seven to ten days following the date the schedule of income payments is calculated.

CP at 686.

The body of the Nationwide annuity contract read, in part:

The Annuitant . . . must be age 85 or younger at the time the Contract is issued, unless the Company has approved a request for an Annuitant or Joint Annuitant older than age 85.

. . . .

**Beneficiary**

The Beneficiary is the person who may receive benefits under the Contract if the Annuitant (and the Joint Annuitant, if any) dies after the Income Start Date.

If more than one Beneficiary survives the Annuitant (and the Joint Annuitant, if any), each will share equally unless otherwise specified on the application. If there is no surviving Beneficiary upon the death of the Annuitant, all Beneficiary rights will vest in the Contingent Beneficiary, and if more than one Contingent Beneficiary survives, each will share equally unless otherwise specified on the application. If no Beneficiary or Contingent Beneficiary survives, the Annuitant (and the Joint Annuitant, if any) all Beneficiary rights will vest with the Owner(s), or the estate of the last surviving Owner.

If the Annuitant (and the Joint Annuitant, if any) dies prior to the Income Start Date, the Beneficiary will be entitled to the proceeds of the single purchase payment if there is no surviving Owner or Joint Owner.

. . . .

**INCOME OPTIONS**

. . . .

**Single Life**

Annuity payments will be paid during the lifetime of the Annuitant. Payments will cease with the last payment due prior to the death of the Annuitant.

. . . .
**Death of Annuitant**
If the Annuitant dies prior to the Income Start Date, this Contract will terminate and the single purchase payment less any applicable premium tax shall be paid to the surviving Owner.

If there is no surviving Owner the Beneficiary will be entitled to receive a single purchase payment or to receive annuity benefits in accordance with the Required Distribution Provisions section.

. . . .
**Death of the Annuitant**
If the Annuitant dies after the Income Start Date, the terms of the income option as elected by the Owner at time of application will apply.

CP at 688-89, 693.

In spring 2009, Marr and Elizabeth Waddoups discussed the annuity purchase with Elizabeth's daughter, Cheryl Miller. During testimony in a deposition, Miller did not recall discussing with her mother and stepfather whether the Nationwide single premium immediate annuity included a death benefit. Nevertheless, the three spoke about the need to live a particular length of time in order to recoup one's investment in the annuity and the risk involved in the annuity. Miller understood the single premium immediate annuity to lack a death benefit. Miller did not specifically testify that Marr Waddoups understood the annuity lacked a death benefit. Miller described her stepfather as proficient in math and accounting.

Clark Permann also assisted Marr and Elizabeth Waddoups to purchase a similar single premium immediate annuity for Elizabeth. According to Permann, Marr Waddoups obtained the quote and annuity contract without death benefit for Elizabeth

10

from West Coast Life Insurance, which Elizabeth later cancelled because Permann found a higher paying annuity. According to Permann, Marr Waddoups also procured for Elizabeth a single premium immediate annuity with no death benefit from Penn Mutual.

Clark Permann testified, in his declaration, that he delivered to Elizabeth and Marr Waddoups a copy of the Buyer's Guide to Fixed Deferred Annuities, authored by the National Association of Insurance Commissioners. The guide reads, in part, regarding life only annuities:

> The company pays income for your lifetime. It doesn't make any payments to anyone after you die. This payment option usually pays the highest income possible.

CP at 675.

After the purchase of the Nationwide single premium immediate annuity by Marr Waddoups, Financial Management sent a statement on January 30, 2009, that listed the annuity as holding a cash value of $100,000. Clark Permann himself prepared and sent six quarterly statements to Marr and Elizabeth Waddoups or their heirs that listed the investments Permann managed on the couple's behalf, including the Nationwide annuity. The statements sent before Marr Waddoups' death and dated September 10, 2009, December 1, 2009, March 18, 2010, September 7, 2010, listed the value of the annuity as $100,000. We later mention statements sent after Marr Waddoups' death.

11

Marr Waddoups maintained a ledger book that listed his annuities. The ledger noted, in Waddoups' handwriting, the monthly payments from the Nationwide annuity and showed a decreasing monthly asset value for the annuity.

In July 2009, Marr Waddoups' renal problems progressed to acute renal failure. On October 31, 2011, Marr Waddoups died. His will contained a pour-over provision that bequeathed all of his property to the Waddoups Living Trust.

By the date of Marr Waddoups' death, Nationwide paid thirty-four monthly payments of $1,418 from the annuity. Without taking into consideration income derived by Nationwide over the thirty-four months, Nationwide retained $51,788 of the $100,000 paid for the annuity upon Marr Waddoups' death. On November 14, 2011, Clark Permann sent an e-mail to son Gary Waddoups containing an account summary noting the value of the Nationwide annuity to be $0.

Clark Permann prepared and sent two quarterly statements to Marr Waddoups' heirs, after Marr's death that listed the cash value of the Nationwide annuity. The statements dated November 14, 2011 and December 13, 2011 list the cash value of the single premium immediate annuity as $0.

Gary Waddoups met with Clark Permann regarding Marr Waddoups' account on November 17, 2011. At this meeting, according to Gary, Permann volunteered the comment that he only sold the Nationwide annuity to Marr because Marr "would have just gone elsewhere to buy it." CP at 599.

12

On December 13, 2011, Clark Permann met with Bill Sickles, son of Elizabeth

Waddoups. After the meeting, Permann dictated a note that stated the children of

Elizabeth and Marr Waddoups were "[c]ertainly frustrated with [annuities Marr

previously purchased] and [Permann] discussed [his] dealings with [Marr Waddoups] and

why that was maybe a bad idea." CP at 612.

On June 7, 2012, Elizabeth Waddoups died. On September 12, 2012, the court

appointed Gary Waddoups as personal representative of the Estate of Marr Waddoups.

## PROCEDURE

On March 22, 2013, Gary Waddoups, as personal representative of Marr

Waddoups' estate, sued Clark Permann, Financial Management, Inc., and Nationwide

Life Insurance Company for breach of fiduciary duty, engaging in unfair insurance

practices in violation of RCW 48.30.010, and violating the Consumer Protection Act

(CPA), ch. 19.86 RCW. In his first answer to the complaint, Clark Permann declared:

> 3.8 Defendants deny plaintiff's paragraph 3.8 and further allege that
> Clark L. Permann and Financial Management, Inc. advised H. Marr
> Waddoups against the purchase [of the Nationwide annuity], including
> doing so in the presence of plaintiff, Gary Waddoups.

CP at 25. In his original affirmative defenses, Permann also alleged:

> 15. Gary Waddoups was present when H. Marr Waddoups decided
> to purchase the contract and when Clark Permann advised against the
> purchase.

13

CP at 27. Permann withdrew these two paragraphs from his amended answer and affirmative defenses filed two days later. He now claims that the language in the first answer and affirmative defenses was a mistake. In his declaration in support of his summary judgment motion, Permann did not testify that Gary Waddoups attended any discussion that Permann had with Marr Waddoups nor did Permann testify that he advised Marr Waddoups against purchasing the Nationwide single premium immediate annuity.

On October 8, 2013, Marr Waddoups' four children and three stepchildren signed a Trust and Estate Dispute Resolution Act (TEDRA), ch. 11.96A RCW agreement. The agreement constituted a final distribution of all assets in the Waddoups Living Trust, the Estate of Elizabeth Waddoups, and the Estate of Marr Waddoups, including the claims against Nationwide, Financial Management, and Clark Permann. Elizabeth Waddoups's daughter, Cheryl Miller, and Marr's daughter, Marla Werner, then served as successor trustees of the Waddoups Living Trust. In the TEDRA agreement, all children of Elizabeth Waddoups and of Marr Waddoups assigned all rights to this lawsuit to Gary Waddoups. The assignment to Gary Waddoups of this cause of action included the assignment of any rights the Waddoups Living Trust held. Both trustees of the trust signed the agreement.

Gary Waddoups hired John Olsen in this suit to testify as an expert witness on annuity purchases. Olsen became licensed as an insurance agent in 1973. He has held

14

various leadership positions in associations for financial professionals and held Chartered Life Underwriter, Chartered Financial Consultant, and Accredited Estate Planner designations. Olsen has authored articles on annuity suitability and coauthored the textbook on financial advisor annuity sales. He previously served as an expert witness for plaintiffs and defendants in suits concerning the suitability of annuity contracts.

John Olsen prepared a report that disclosed his opinions regarding the sale of the single premium immediate annuity to Marr Waddoups. Olsen attached the report to a declaration in opposition to defendants' summary judgment motion. In his report Olsen listed the documents he relied on in forming his opinions, presented a chronology for the sale of the annuity, explained the types of single premium immediate annuities, discussed Marr Waddoups' life expectancy as impacted by his health conditions, examined the suitability of the annuity for Waddoups, mentioned the omission of language explaining the absence of any death benefit in the annuity documents, and declared his opinions.

John Olsen opined that industry practice required Clark Permann to present to Marr Waddoups other annuity options with death benefits to compare with the Nationwide single premium immediate annuity sold to Waddoups. Waddoups could not make an informed choice without comparing options. No documentary evidence established that Permann showed Marr Waddoups a quote for a life annuity with a refund feature. Permann should have particularly shown Waddoups options because Permann claimed to have advised against the Nationwide annuity. According to Olsen, Permann's

15

sale of the annuity was a violation of his duty under cannons and rules of financial

services professionals to place one's client's interests ahead of one's own. Permann also

violated this duty when selling Waddoups an annuity paying $1,418 per month when

Waddoups could buy the same product at the same price from New York Life and receive

$1,500 per month.

John Olsen opined that an experienced annuities agent would know that Marr

Waddoups' medical conditions would likely lessen his life expectancy. He explained:

> As Mr. Permann was aware of Mr. Waddoups' diabetes, he would
> have known that it was unlikely that a "life only" annuity would pay out, as
> income, even the amount of the single premium, much less any earnings
> (interest). It would have taken approximately 70.5 months (5.88 years) for
> the annuity to pay out $100,000. That is roughly the life expectancy of a
> healthy 85-year-old male. But Mr. Waddoups had diabetes and Mr.
> Permann knew this.

CP at 550. Olsen noted that Clark Permann, in his original answer, claimed to have

advised Marr Waddoups against the purchase of the annuity. Olsen further opined that

the

> [S]uitability standard requires that insurance agents recommend only
> a product which they have determined, on the basis of the information they
> have learned about their client, is in that client's interest—that it is
> "suitable" for that client. The fiduciary standard requires an advisor to put
> his client's interest ahead of his own.

CP at 166. Olsen stated that Permann violated the standard of care by selling the annuity

to Marr Waddoups.

John Olsen testified to the expectations of a reasonable consumer of annuities:

16

After examining the annuity quote, the application, and the annuity contract, I have concluded that a reasonably prudent consumer might well be unaware that the contract option entitled "single life" provides no death benefit. While the "Purchase Payment Options" page of the contract (page 6 - PERMANN000219)) does reveal in a single sentence that "Payments will cease with the last payment due prior to the death of the annuitant," that fact is not revealed in the first page of the contract (the Contract Information page), the annuity quote, or the annuity application. It is revealed in the Supplementary Agreement Data Page (Exhibit 7 to Mr. Permann's Declaration of 15 May 2014[)], but that document was not available until after the annuity contract was issued.

CP at 552.

John Olsen highlighted the language in the annuity application that asked for a designation of a beneficiary. The application form did not warn of the lack of a death benefit. Olsen emphasized the annuity's contract information page does not expressly disclose the annuity lacks a death benefit and instead misleads the purchaser into expecting a death benefit since the page lists a beneficiary. Clark Permann's quarterly statements listing the cash value of the annuity as $100,000 would also mislead the reasonable consumer. Olsen declared that the standard industry practice for an agent, who has recommended a life only annuity, is to emphasize the absence of a death benefit and to document the applicant's understanding of the lack of a death benefit. His review of Marr Waddoups' records revealed no earlier purchase of an annuity without death benefits.

17

John Olsen concluded his report with:

> For the above reasons, I believe that the sale of this annuity by Mr. Permann to Mr. Waddoups was clearly unsuitable, that it violated standard industry practices of the time, and that it injured Gary Waddoups, who might, had Mr. Permann conveyed to Mr. Waddoups the absence of a death benefit in the "single life" option and shown him at least one option with a death benefit, received such a death benefit when his father died less than three years after purchasing the annuity.

CP at 561.

Nationwide conducted a deposition of John Olsen. During the deposition, Nationwide questioned Olsen about his medical knowledge and the use of medical conditions to determine the annuity was unsuitable for Marr. Olsen admitted he was not a doctor and had no medical training.

Nationwide, Financial Management, and Clark Permann moved for summary judgment. Defendants argued they were entitled to summary judgment because: (1) the Estate of H. Marr Waddoups is not the real party in interest and has no standing to bring the claims asserted in the complaint, (2) RCW Chapter 48.30 does not provide an independent cause of action, (3) Gary Waddoups cannot present any admissible, competent evidence of any wrongdoing by any defendant, (4) Gary Waddoups cannot prove causation of any damages since Marr Waddoups elected to buy the annuity knowing it lacked a death benefit and Waddoups had the right to make this decision, and (5) the statute of limitations bars all claims.

18

In support of his and other defendants' summary judgment motion, Clark Permann filed a declaration in which he testified to his meetings and conversations with Marr Waddoups. Permann also filed excerpts from his deposition testimony, during which he also spoke of conferences and discussions with Marr. Gary Waddoups, in turn, filed a motion to strike portions of the declaration of Clark Permann supporting the summary judgment motion on the basis that Permann's repeat of conversations with Marr Waddoups constituted inadmissible hearsay under ER 803 and the dead man's statute bars the testimony. Gary Waddoups did not seek the striking of any of Permann's deposition testimony.

Defendants moved to exclude opinions by John Olsen. Defendants maintained that Olsen usurped the role of the trier of fact by instructing how to rule and drawing inferences from the evidence or the lack of evidence.

In response to defendants' summary judgment motions, the trial court ruled that Gary Waddoups had standing to bring this suit. The trial court ruled that the deadman's statute did not apply to Marr Waddoups' conversations with Clark Permann because Gary Waddoups waived his right to enforce the statute when he argued that Permann failed to warn Marr of the lack of death benefits. Nevertheless, the trial court ruled as hearsay and ignored Permann's testimony that Marr Waddoups verbally expressed that he understood that neither he nor his beneficiaries would receive anything upon his death. The court did not exclude as hearsay testimony from Clark Permann that he told Marr Waddoups of the

19

lack of a death benefit.

The trial court partially granted the motion to exclude opinion testimony by John Olsen. In his oral ruling at the conclusion of argument, the court excluded Olsen's opinion on how diabetes impacted Marr Waddoups' life expectancy. The court also excluded Olsen's belief that language in the annuity and other documents is ambiguous to an average person or was ambiguous to Marr Waddoups. During his oral ruling, the trial court stated it would consider Olsen's testimony of what steps Clark Permann should have taken when selling the annuity, including what information Permann should have disclosed to Waddoups. In its written order granting in part the motion to strike, the trial court excluded the following testimony of John Olsen:

> The suitability of the annuity based upon Mr. Waddoups' health and/or life expectancy;
> The annuity quote, the application, and the annuity contract might lead a consumer to reach conclusions about whether the contract included a death benefit;
> Conclusions about the evidence based on the absence of documentation provided by Plaintiff.

CP at 849.

The trial court granted Nationwide and Clark Permann's motion for summary judgment. The trial court noted that Gary Waddoups carried the burden to show that Clark Permann failed to warn Marr Waddoups of the lack of a death benefit. The trial court concluded that the only reasonable inference from the undisputed facts was that Clark Permann advised Marr Waddoups of the lack of death benefits. The court reached

20

this factual conclusion from the testimony of Clark Permann and Cheryl Miller. From this factual conclusion, the trial court reasoned that Clark Permann did not violate any fiduciary duty and Gary Waddoups could not sustain any of his claims. The trial court also dismissed any claim based on Marr Waddoups' purchasing a Nationwide annuity with a lower monthly payment than the New York Life annuity because Marr would have known he purchased an inferior product for the same price.

## LAW AND ANALYSIS

### Standing

We first address standing and evidentiary questions before reaching the merits of the respondents' summary judgment motions. Respondents contend that Gary Waddoups lacks standing as personal representative of the Estate of Marr Waddoups to bring this suit. Respondents underline that, under Marr Waddoups' will, all of Waddoups' assets passed to the Waddoups Living Trust. In turn, the living trust assigned its interest in this lawsuit to Gary Waddoups individually, not as representative of his father's estate. Thus, according to respondents, Gary must sue in his individual capacity, not representative capacity. We note that Gary sued only in his representative capacity and that the transfer to him individually occurred after the filing of this lawsuit.

Marr Waddoups used a Waddoups Living Trust check to purchase the Nationwide single premium immediate annuity. Nevertheless, Marr purchased the annuity in his own name. Both the annuity application and the contract refer to Marr Waddoups as the sole

21

annuity owner. The trust is not mentioned in any of the annuity documents.

Nevertheless, the annuity passed to the living trust upon the death of Marr.

Several statutes when read together compel the conclusion that Gary Waddoups as

the personal representative of the Estate of Marr Waddoups controlled the assets in the

Waddoups Living Trust upon the death of Marr. At least, Gary controlled the assets until

proof of payment of all liabilities of Marr. RCW 11.48.010 declares:

> It shall be the duty of every personal representative to settle the
> estate, including the administration of any nonprobate assets within control
> of the personal representative under RCW 11.18.200, in his or her hands as
> rapidly and as quickly as possible, without sacrifice to the probate or
> nonprobate estate. The personal representative shall collect all debts due
> the deceased and pay all debts as hereinafter provided. The personal
> representative shall be authorized in his or her own name to maintain and
> prosecute such actions as pertain to the management and settlement of the
> estate, and may institute suit to collect any debts due the estate or to recover
> any property, real or personal, or for trespass of any kind or character.

RCW 11.48.090 repeats the dictates of RCW 11.48.010. The former statute reads:

> Actions for the recovery of any property or for the possession
> thereof, and all actions founded upon contracts, may be maintained by and
> against personal representatives in all cases in which the same might have
> been maintained by and against their respective testators or intestates.

RCW 11.48.090. RCW 11.48.010 grants administration rights to the personal

representative of nonprobate assets listed in RCW 11.18.200. The latter statute provides:

> (1) Unless expressly exempted by statute, a beneficiary of a
> nonprobate asset that was subject to satisfaction of the decedent's general
> liabilities immediately before the decedent's death takes the asset subject to
> liabilities, claims, estate taxes, and the fair share of expenses of

22

administration reasonably incurred by the personal representative in the transfer of or administration upon the asset. . . .

(2) The following rules govern in applying subsection (1) of this section:

. . . .

(e) A trust for the decedent's use of which the decedent is the grantor is subject to the decedent's liabilities, claims, estate taxes, and administration expenses as described in subsection (1) of this section, to the same extent as the trust was subject to claims of the decedent's creditors immediately before death under RCW 19.36.020.

RCW 11.18.200. Pursuant to RCW 11.18.200(2)(e), we read next RCW 19.36.020, which declares, in part, in a run-on sentence:

That all deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the existing or subsequent creditors of such person.

RCW 11.48.090 granted Gary Waddoups authority to administer and sue to collect nonprobate assets subject to the liabilities of Marr Waddoups. Marr Waddoups created the Waddoups Living Trust for his own use. He retained the right to control and dispose of trust assets during his lifetime. RCW 11.18.200(2)(e) and RCW 19.36.020 rendered the Waddoups Living Trust a nonprobate asset subject to Marr's liabilities.

Respondents might question our holding by mentioning the lack of evidence of any debts of Marr Waddoups at the date of his death. Nevertheless, respondents did not raise that argument at the time that the trial court held that Gary Waddoups possessed standing. A party may not raise a new argument on appeal that the party did not present to the trial court. *In re Det. of Ambers*, 160 Wn.2d 543, 557 n.6, 158 P.3d 1144 (2007).

23

Defendants filed a motion for summary judgment. In a summary judgment motion, the burden is on the moving party to demonstrate that there is no genuine issue as to a material fact and that, as a matter of law, summary judgment is proper. *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). Defendants provided no evidence of the lack of any debts upon Marr Waddoups' death.

Respondents also emphasize that the Waddoups Living Trust assigned its rights to this lawsuit to Gary Waddoups individually and Gary has not sued in his personal right. This argument ignores the fact that the trust assigned its rights to Gary after the filing of this suit. Because Gary had authority to commence this action, he may proceed with the action until the trial court enters an order to the contrary.

CR 17(a) requires that every action be commenced by a "real party in interest," which includes executors and administrators of an estate. When a transfer of interest occurs after suit has commenced, CR 25(c) controls. When a party transfers its interest in the litigation after filing of suit, CR 25(c) governs the substitution of parties. *Stella Sales Inc. v. Johnson*, 97 Wn. App. 11, 17, 985 P.2d 391 (1999). CR 25(c) reads in part:

> **(c) Transfer of Interest.** In case of any transfer of interest, *the action may be continued by or against the original party* unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

(Emphasis added.) CR 25 does not require substitution of the parties. Any action may be continued "by or against the original party." CR 25(c). Whether or not the transferee

substitutes as a party, he will be bound by an adverse judgment because his rights do not supersede the rights of the transferor. *Stella Sales*, 97 Wn. App. at 17-18 (1999).

No party moved the superior court to substitute or join Gary Waddoups in his individual capacity. One may wonder why Gary Waddoups did not move to add himself individually to the lawsuit to avoid any defense of standing. Nevertheless, we conclude Gary Waddoups continues to hold standing as the personal representative of the Estate of Marr Waddoups to prosecute this lawsuit.

## Dead Man Statute

Before analyzing the merits of the summary judgment order dismissing Gary Waddoups' suit, we must determine what evidence to consider in this analysis. This determination not only demands a review of summary judgment principles concerning the mechanics of disputing facts but requires an examination of the Washington dead man statute and rules concerning the scope of opinion testimony. This determination prolongs our opinion.

In his declaration supporting his and other defendants' summary judgment motions, Clark Permann repeated conversations between Marr Waddoups and him during or near the date of the purchase. Permann also testified to the same conversations during his deposition. The trial court excluded comments uttered by Marr Waddoups during the conversations on the basis of the hearsay rule. The trial court allowed as summary judgment evidence remarks by Permann not to prove the truth of the content of the

25

comments but for evidence that Permann bespoke the remarks to Marr. According to Permann, Waddoups brought a quote for a New York Life single premium immediate annuity. He explained to Waddoups that the Nationwide annuity provided no death benefit and he elucidated the advantages and disadvantages of the annuity. According to Permann, Marr Waddoups, when purchasing the Nationwide annuity, was cogent and knowledgeable about his purchase and financial needs.

Gary Waddoups contends that the trial court erred in denying his motion to strike testimony of Clark Permann surrounding the purchase of the annuity, including Permann's averment that he warned Marr Waddoups of the lack of a death benefit. Gary contends the testimony violates the dead man statute. Respondents argue that Gary waived his right to enforce the dead man statute and to strike Permann's declaration by failing to object to the same testimony of Permann in his deposition and by submitting testimony regarding the subject transaction.

We consider the respondents' first argument overly technical. In his motion to strike, Gary Waddoups objected to Clark Permann's declaration testimony, which was the same testimony uttered by Permann in his deposition. Thus, respondents knew the nature of the testimony to which Waddoups objected. The respondents suffered no prejudice as a result of Waddoups' oversight in omitting language in his motion to encompass deposition testimony. We need not address the respondents' first argument, however, because we agree with the respondents' second argument.

We later decline to rely on Clark Permann's testimony of rendering a warning to Marr Waddoups for purposes of the summary judgment motion. We address the admissibility of the testimony, however, because the issue is one of importance on remand for trial. We have ruled that we will address an argument raised for the first time on appeal, despite the general rule to the contrary, when a new trial is required for other reasons and addressing the merits of the argument will provide guidance to the trial court on remand. *Geschwind v. Flanagan*, 65 Wn. App. 207, 211, 828 P.2d 603 (1992) *aff'd in part, rev'd in part*, 121 Wn.2d 833, 854 P.2d 1061 (1993). We may and should similarly address an issue fully briefed by the parties, even if we conclude the issue is of no consequence on appeal, if a ruling on the merits of the contention will provide guidance on remand.

Many states have abolished the dead man statute. Washington has not. RCW 5.60.030, Washington's dead man statute, the only legal term unconcerned with gender neutrality, provides in relevant part:

> No person offered as a witness shall be excluded from giving evidence by reason of his or her interest in the event of the action, as a party thereto or otherwise, but such interest may be shown to affect his or her credibility: PROVIDED, HOWEVER, That in an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person, or as deriving right or title by, through or from any deceased person, . . . a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased.

27

A person is a party in interest under RCW 5.60.030 when he or she stands to gain or lose in the action in question. *In re Estate of Shaughnessy*, 97 Wn.2d 652, 656, 648 P.2d 427 (1982). The dead man statute blankets both words and acts involving a transaction with the deceased. A transaction means the doing or performing of some business between parties or the management of any affair. *In re Estate of Wind*, 27 Wn.2d 421, 426, 178 P.2d 731 (1947). The dead man statute precludes both positive assertions that a transaction or conversation occurred and negative assertions denying a transaction or conversation. *Botka v. Estate of Hoerr*, 105 Wn. App. 974, 980, 21 P.3d 723 (2001); *Martin v. Shaen*, 26 Wn.2d 346, 352-53, 173 P.2d 968 (1946).

The dead man statute promotes fairness. A party should not be free to testify about a transaction with a deceased person because it would be unfair for the court to reach a decision about the transaction based on only one side of the story. Death having closed the lips of one party, the law closes the lips of the other. *In re the Estate of Cunningham*, 94 Wash. 191, 193, 161 P. 1193 (1917). The purpose of RCW 5.60.030 is to prevent interested parties from giving self-serving testimony about conversations or transactions with the decedent. *Wildman v. Taylor*, 46 Wn. App. 546, 549, 731 P.2d 541 (1987).

Respondents agree that the dead man statute would preclude testimony of Clark Permann concerning the transaction with Marr Waddoups and conversations he had with Waddoups. The respondents rely on a waiver of the statute by Gary Waddoups.

28

The beneficiary of the dead man statute may waive its protection. *Bentzen v. Demmons*, 68 Wn. App. 339, 345, 842 P.2d 1015 (1993). Courts will not allow a party to introduce testimony about a transaction and then assert the dead man statute to prevent the adverse party's explanatory testimony. *Johnson v. Peterson*, 43 Wn.2d 816, 819, 264 P.2d 237 (1953). The party who invokes the protection of the statute must himself respect it. *Johnston v. Medina Improvement Club*, 10 Wn.2d 44, 60, 116 P.2d 272 (1941). This rule of waiver extends both to direct testimony of the transaction as well as testimony implying that the transaction did not occur. *Bentzen v. Demmons*, 68 Wn. App. 339. The dead man statute precludes not only positive assertions that a transaction or conversation with the decedent took place, but also testimony of a negative character denying interactions with the decedent. *Botka*, 105 Wn. App. at 980; *Bentzen v. Demmons*, 68 Wn. App. at 346. Admission of financial documents does not constitute a waiver of the statute. *Bentzen v. Demmons*, 68 Wn. App. at 346, n.6.

Gary Waddoups, in his declaration, discussed the transaction between his father and Clark Permann when Waddoups repeated Permann's remark that he sold the Nationwide annuity because Marr would have purchased another annuity elsewhere. In his appellate brief, Gary Waddoups emphasizes that his father told Permann of the father's diabetes.

In his expert report and declaration, John Olsen repeatedly referenced Permann's testimony concerning the transaction between Permann and Marr Waddoups. Olsen

29

testified that Permann knew that Waddoups suffered from diabetes, knowledge Permann gained from a conversation with Waddoups. Olsen reiterated Permann's declaration that Waddoups appeared in his office with a quote for a New York Life annuity. Olsen averred that Permann advised Waddoups not to purchase the Nationwide annuity, which recommendation occurred during a conversation between the two. Olsen emphasized, in his declaration, the lack of documentation of Permann having presented Marr Waddoups an alternative single premium immediate annuity with a death benefit or Permann having told Waddoups about such an alternative. Olsen testified that Permann claims he told Waddoups of the absence of a death benefit. Olsen underscored Clark Permann's signing a Crump Suitability Form for Fixed Annuities, wherein Permann acknowledged that he obtained information from Marr Waddoups and, based on the information, he recommended the purchase of the Nationwide annuity. Olsen opined that Permann did not recommend the New York Life annuity with a higher payout but instead recommended the Nationwide annuity, for which he would garner a commission. We hold that Gary Waddoups' testimony, Waddoups' appeal brief, and John Olsen's thorough review of Clark Permann's testimony of the conversations between Marr Waddoups and Permann and the circumstances surrounding the transaction between Waddoups and Permann waived the protection of the dead man statute.

An apposite decision is *Bentzen v. Demmons*, 68 Wn. App. 339 (1993), an action to enforce an oral contract to make a will. Ingrid Bentzen claimed that she lived with and

30

cared for the decedent until the time of the decedent's death. Bentzen testified that, in return for her assistance, the decedent promised to leave her estate to her rather than to the decedent's nephew. The trial court ruled that Bentzen could not testify about the alleged agreement because of the dead man statute. On appeal, this court reversed and held that the nephew waived the protection of the dead man statute by submitting an affidavit in a summary judgment proceeding. The nephew declared in the affidavit that his aunt never told him of any agreement with Bentzen and that he otherwise lacked knowledge of such an agreement. This court considered the affidavit to address "the heart" of plaintiff's claims such that plaintiff could rebut the nephew's assertions. Gary Waddoups similarly forwards testimony addressing the core of the transaction and communications between Marr Waddoups and Clark Permann.

*Erickson v. Robert F. Kerr, MD, Inc.*, 125 Wn.2d 183, 883 P.2d 313 (1994) supports Gary Waddoups' position that he never waived the shield of the dead man statute. During the time that Robert Kerr treated Phillipa Erickson for depression, she committed suicide. Erickson's estate sued for malpractice and sought an order in limine precluding Dr. Kerr from testifying as to conversations with the decedent. Dr. Kerr argued that it was fundamentally unfair for the estate to admit medical records, draw factual inferences therefrom by use of expert witnesses, and then invoke the statutory bar to silence any reply or explanation by him. The Supreme Court reversed and remanded for a new trial after a verdict favoring Dr. Kerr. Our high court observed that

31

commentators disfavor deadman statutes for reasons argued by Kerr. Nevertheless, our legislature must address any arguments grounded in fairness.

Another decision even more helpful to Gary Waddoups than *Erickson v. Robert F. Kerr* is *Lasher v. University of Washington*, 91 Wn. App. 165, 957 P.2d 229 (1998). Jeffrey Lasher suffered a rare heart disease that Dr. Leon Greene treated. Lasher sustained serious brain damage after collapsing from cardiac arrest while playing basketball. Lasher's guardian sued Greene and his employer for failing to warn Lasher of the risk of strenuous activities such as recreational basketball and the failure to advise Lasher of the benefits of an implanted defibrillator. This court reversed a jury verdict in favor of Dr. Greene. This court held that the dead man statute barred Greene's testimony that he habitually warned patients of such risks. Lasher's guardian did not waive the dead man statute by reason of claiming that Greene failed to give warnings or advice.

We question the wisdom of *Erickson v. Robert F. Kerr*. We also suspect the validity of the *Lasher* decision in light of the rule that arguing the negative or asserting the absence of a conversation is tantamount to testifying to the conversation and constitutes a waiver of the dead man statute. Fairness demands that, if Gary Waddoups sues Clark Permann for allegedly failing to warn Marr Waddoups of the absence of a death benefit, Permann should be free to defend himself by testifying he uttered such a warning. One should not be free to assert a factual claim to the trier of fact and then shut his opponent's mouth from controverting the assertion.

32

RCW 5.60.030 admits no exceptions, let alone an exception based on waiver. If the legislature holds a monopoly on advancing fairness, Washington courts should have never applied waiver to the dead man statute. Conversely, if courts can engraft principles of waiver to the dead man statute in the first place to promote equity, we should be free, without legislative action, to extend waiver to circumstances when the decedent's representative insinuates certain facts by claims litigated.

Since this court subjugates itself to our Supreme Court, we would follow the teachings of *Erickson v. Robert F. Kerr* if apt for the circumstances of this appeal. Nevertheless, Gary Waddoups' response to defendants' summary judgment motion traveled miles beyond use of an expert to draw inferences from records. Waddoups and his expert recurrently recounted conversations between Marr Waddoups and Clark Permann and details of the transaction between the two. For this same reason, we decline to follow *Lasher v. University of Washington.*

We remand this case to the trial court for further proceedings on other grounds. The remand raises the question of whether waiving the dead man statute in order to respond to a summary judgment motion also constitutes a waiver for testimony in a later trial. We hold in the affirmative.

In *Bentzen v. Demmons*, 68 Wn. App. 339 (1993), previously discussed, this court held that waiver by testimony in a summary judgment affidavit also waived the dead man statute protection for purposes of the trial. *Hill v. Cox*, 110 Wn. App. 394, 406, 41 P.3d

33

495 (2002) has the same outcome whereby a party waived the dead man statute with a summary judgment affidavit. *Hill* and *Bentzen* are distinguishable in that this court in each opinion noted that the party seeking armor through the statute sought to limit issues at trial by submitting the affidavit. Gary Waddoups submitted the summary judgment testimony in an effort to preserve, not preclude, issues for trial. We consider this distinction of no import.

Other jurisdictions have held that the waiver of the dead man statute for one court hearing constitutes a waiver for all court hearings in the case or in a similar case. In *Sessions v. Summers*, 177 So. 2d 720, 722 (Fla. Dist. Ct. App. 1965), the court ruled that waiver of the protection in a summary judgment hearing extended to the trial. In *Finch v. McCrimmon*, 100 Colo. 315, 317, 67 P.2d 623 (1937), the Colorado Supreme Court held that waiver of the dead man statute in a first trial extended to a second trial after remand. In *Billingsley v. Gulick*, 256 Mich. 606, 618, 240 N.W. 46 (1932), the Michigan Supreme Court held waiver of the statute in one suit constituted a waiver in a second suit between the same parties when the cases had similar issues. In *In re Trautmann's Estate*, 300 Mo. 314, 254 S.W. 286, 289 (1923), the Missouri high court held that a waiver of the statute during a hearing in probate court constituted a waiver during a hearing in the circuit court involving the same estate.

## Clark Permann Testimony

We have held that, because of Gary Waddoups' waiver, the dead man statute does

34

not preclude the admission of Clark Permann's testimony pertaining to conversations he had with Marr Waddoups concerning the sale of the Nationwide annuity. We now address the import we assign to Permann's testimony for purposes of the defendants' summary judgment motion.

Based on the testimony of Clark Permann, the trial court assumed, for purposes of summary judgment, that Permann warned Marr Waddoups of the absence of a death benefit with the Nationwide annuity. Because no one else was present during the conversations between Marr and Permann, Gary Waddoups lacks any direct evidence contradicting Permann's claim of rendering a warning. Gary disputes, nonetheless, that Permann uttered any warnings. The dispute raises the important issue of whether, when defending a summary judgment motion, a party must posit direct evidence to restrain the court from determining the opposing party uttered a statement when the moving party is the only person living who was privy to the conversation.

In summary judgment procedure, the moving party must first show the absence of an issue of material fact. *Ingersoll v. DeBartolo, Inc.*, 123 Wn.2d 649, 654, 869 P.2d 1014 (1994). The burden then shifts to the nonmoving party. *Ingersoll v. DeBartolo*, 123 Wn.2d at 654. To survive summary judgment, the nonmoving party must set forth specific facts that rebut the moving party's contentions and that posit a genuine issue as to a material fact. *Seiber v. Poulsbo Marine Ctr. Inc.*, 136 Wn. App. 731, 736-37, 150 P.3d 633 (2007). The nonmoving party may not rely on speculation or argumentative

35

assertions, nor may it have its affidavits considered at face value. *Seiber*, 136 Wn. App. at 736. If the nonmoving party fails to offer sufficient evidence of an element essential to her case, the trial court should grant summary judgment. *Hines v. Data Line Sys., Inc.*, 114 Wn.2d 127, 148, 787 P.2d 8 (1990).

Washington and most other states have crafted an exception to the rule that the nonmoving party must put forward specific material facts to rebut the movant's declarations and deposition testimony. We are reluctant to grant summary judgment when material facts are particularly within the knowledge of the moving party. *Balise v. Underwood*, 62 Wn.2d 195, 200, 381 P.2d 966 (1963); *Arnold v. Saberhagen Holdings, Inc.*, 157 Wn. App. 649, 661-62, 240 P.3d 162 (2010); *Riley v. Andres*, 107 Wn. App. 391, 395, 27 P.3d 618 (2001). In such cases, the matter should proceed to trial in order that the opponent may be allowed to disprove such facts by cross-examination and by the demeanor of the moving party while testifying. *Brown v. Brown*, 157 Wn. App. 803, 820, 239 P.3d 602 (2010); *Arnold v. Saberhagen Holdings*, 157 Wn. App. at 662; *Mich. Nat'l Bank v. Olson*, 44 Wn. App. 898, 905, 723 P.2d 438 (1986); *Felsman v. Kessler*, 2 Wn. App. 493, 496-97, 468 P.2d 691 (1970). The purpose behind this rule echoes the reason behind the dead man statute. The trial court should not consider as verity a self-serving statement of a litigant when the opposing party lacks access to the information found in the statement.

One illustrative decision is *Riley v. Andres*, 107 Wn. App. 391 (2001). The Rileys

36

claimed that they adversely possessed part of the Andres' neighboring lot while the Andres' predecessors in title, the Gaults, owned it. The trial court granted the Rileys summary judgment because the Andres lacked evidence to contradict the Rileys' testimony of their use of the disputed land. The Gaults were dead. We reversed because the Andres placed the credibility of the Rileys in issue by offering statements by Mrs. Riley that the land belonged to the Andres. This court wrote:

> And where, as here, the material facts are based solely upon the moving party's affidavits, credibility is especially important. In such a case, the nonmoving party should have the opportunity to expose the moving party's demeanor while testifying at trial.

*Riley v. Andres*, 107 Wn. App. at 398.

Another informative decision is *Michigan National Bank v. Olson*, 44 Wn. App. 898 (1986). The trial court granted the bank summary judgment against Annikki Olson for charges for the purchase of gems in Bangkok, Thailand, on her credit card. Olson denied any knowledge of the credit transaction. Olson speculated that her late husband's Bangkok lover purchased the gems. When Olson noticed the charge, she confronted her husband, who denied knowledge of the transaction, and she cancelled the credit card. The bank relied on a deposition of the Bangkok merchant who sold the gems. The merchant identified Mr. Olson as receiving the gems. We considered the statement of the merchant as self-serving. Since the statement could only be disproved by cross-examination, we reversed the summary judgment in favor of the bank.

In *Balise v. Underwood*, 62 Wn.2d 195, 381 P.2d 966 (1963), the plaintiff needed to prove that one defendant was in the course of employment of the other defendant at the time of the accident in order to recover against the other defendant. Our Supreme Court noted that the plaintiff would need to rely on more than an attack on the credibility of defense witnesses to prevail at trial. Nevertheless, since only the defendants possessed information as to employment, the court reversed a summary judgment granted the employer and remanded the case for trial.

Washington case law may direct the trial court to automatically deny the summary judgment motion if important information lies solely in the possession of the moving party. Or the case law may permit denial of the motion, despite the absence of a direct contradiction of the moving party's evidence, only if the defending party posits some circumstantial evidence to rebut the movant's evidence. We need not decide which rule to adopt since Gary Waddoups provides some circumstantial evidence. Despite the claim of an oral warning, Clark Permann produced no document that confirmed the warning. A trier of fact could reasonably conclude that if a professional warns the client about a product being sold that the professional would place the warning in writing. Annuity documents referenced a beneficiary, an aspect that suggested a death benefit. Statements sent by Clark Permann showed a cash value, a factor also suggesting a death benefit. This circumstantial evidence could refute Permann's claim that he warned Marr Waddoups and could establish that Marr Waddoups believed he purchased an annuity

38

with a death benefit.

## Olsen Opinions

We continue to address what evidence to consider when reviewing the trial court's summary judgment order. The trial court excluded some of the testimony of John Olsen, Gary Waddoups' expert financial advisor. The trial court barred, for purposes of the summary judgment motion, Olsen's opinion that the Nationwide annuity did not suit Marr Waddoups' needs based on his health and life expectancy and his opinion that the annuity quote, policy application, and contract would mislead a reasonable consumer about the lack of a death benefit. We note that the court's oral ruling stating that Olsen may testify to reasonable steps a financial planner should exercise in the sale of any annuity may conflict with the written order. To the extent oral rulings conflict with a written order, the written order controls over any apparent inconsistency with the court's earlier oral ruling. *State v. Mallory*, 69 Wn.2d 532, 533-34, 419 P.2d 324 (1966); *State v. Skuza*, 156 Wn. App. 886, 898, 235 P.3d 842 (2010).

Washington contains an anomaly. Generally, we review all evidentiary rulings made in conjunction with a summary judgment motion de novo. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015); *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Nevertheless, Washington courts have applied the abuse of discretion standard when reviewing trial court rulings, on summary judgment, as to the admissibility of an expert opinion. *E.g. Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d

39

909, 919, 296 P.3d 860 (2013); *Moore v. Hagge*, 158 Wn. App. 137, 155, 241 P.3d 787 (2010); *Stenger v. State*, 104 Wn. App. 393, 407, 16 P.3d 655 (2001). We do not resolve this inconsistency because our two rulings would remain the same under either standard.

Expert testimony is admissible if the expert is qualified and relies on generally accepted theories and the testimony would be helpful to the trier of fact. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 355, 333 P.3d 388 (2014). The opinion of an expert must pertain to the facts of the particular case. *Tortes v. King County*, 119 Wn. App. 1, 12, 84 P.3d 252 (2003). An expert may not testify about information outside his area of expertise. *In re Marriage of Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012).

Respondents contend that John Olsen could not testify to the suitability of the annuity based on Marr Waddoups' health and life expectancy because Olsen lacked medical training. Nevertheless, Olsen was a long term insurance agent with multiple professional designations. Olsen wrote articles on the suitability of annuities and authored the textbook on annuity sales. Olsen was qualified to opine that the suitability of a life contingent annuity depends on the health of the annuitant. Medical training may be necessary to diagnose Marr Waddoups with diabetes and his other ailments or to project a life expectancy of Waddoups based on his medical condition. But medical training is not necessary for identifying health as an important factor when selling an annuity to a client. Olsen based his testimony on Waddoups' diagnosed medical conditions. He did not diagnose Waddoups. We hold the trial court should have

40

considered John Olsen's testimony concerning the suitability of the Nationwide annuity.

*In re Marriage of Katare*, 175 Wn.2d 23 (2012) has limited application but supports Gary Waddoups' position. In *Katare*, our Supreme Court held that an attorney with seventeen years of experience with child abduction cases was qualified to testify regarding risk factors for child abduction and the consequences of abduction to India. The court reasoned, even though the attorney had no formal education on child abduction, never been to India, and had never interacted with the potential abductor, his experience in the field of child abduction provided the qualifications necessary to testify as an expert.

John Olsen's years of experience in insurance and expertise in annuities permits him to opine on relevant risk factors of an annuity sale. His testimony is helpful to the trier of fact. His opinion on suitability would be helpful to a jury because it is beyond the common knowledge of an average layperson. *See State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). Few triers of fact understand the variety, characteristics, and suitability of annuities.

The trial court also excluded John Olsen's inferences drawn from the absence of documentation provided by Clark Permann and testimony as to how a reasonable person would read insurance documents. Gary conflates these two rulings by designating, as error, one ruling that prohibited testimony from John Olsen about the failure of the Nationwide annuity application and contract to clearly state the absence of a death benefit

41

such that a consumer might be misled to believe that the annuity included a death benefit. Thus, we amalgamate the two rulings in our analysis.

We rule that the trial court properly excluded John Olsen's testimony on whether the language of the annuity quote, application, and contract are ambiguous and could confuse a reasonable consumer as to whether the annuity affords a death benefit. Expert opinion on contract interpretation is usually inadmissible. *In re Tobacco Cases I*, 186 Cal. App. 4th 42, 51, 111 Cal. Rptr. 3d 313 (2010). Nevertheless, expert testimony may be admitted to assist a trier of fact in construing an ambiguity in a technical or scientific written instrument. *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998); *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994); *Valley View Dev., Inc. v. United States*, 721 F. Supp. 2d 1024, 1048 (N.D. Okla. 2010). Expert testimony can be used to explain the meaning of technical terms and words of art. *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 281-82 (5th Cir. 1987); *Mariner Energy, Inc. v. Devon Energy Prod. Co.*, 690 F. Supp. 2d 558, 571 (S.D. Tex. 2010), *aff'd*, 571 Fed. Appx. 226 (2013). Gary Waddoups does not argue that the annuity and application language contains technical terms or words of art. He wishes Olsen to opine to ambiguities in the annuity documents. He wishes Olsen to infer that, due to a lack of express warnings, a reasonable consumer such as Marr Waddoups would believe he purchased a death benefit.

No Washington case addresses whether an expert may testify to the expectations of a consumer or to the beliefs of a reasonable consumer. In *Kournikova v. Gen. Media Comm'ns, Inc.*, 278 F. Supp. 2d 1111, 1125 (C.D. Cal. 2003), a claim for false advertising under the federal Lanham Act, the court ruled that expert testimony is not admissible to determine the plain meaning of a word and its effect on a reasonable consumer. In *Halpern v. AARP*, 826 F. Supp. 2d 1, 3 (D.D.C. 2010), the court refused to consider expert testimony on the question of how a reasonable consumer would construe language in marketing literature for an insurance policy. Some courts have allowed experts to testify, in false advertising cases, as to how a reasonable consumer would read language used in the advertising. *United States v. 45/194 Kg. Drums of Pure Vegetable Oil*, 961 F.2d 808, 811 (9th Cir. 1992). None of the courts rendering these opinions directly addressed whether such opinion testimony is admissible.

## Breach of Fiduciary Duty

We finally arrive at the merits of Gary Waddoups' causes of action. Waddoups contends that Clark Permann breached his fiduciary duty to Marr Waddoups and violated the Consumer Protection Act. Permann readily agrees that he assumed the role of a fiduciary when assisting Marr Waddoups in the purchase of an annuity. Financial Management's website declared itself to be a fiduciary of its clients. Respondents do not argue that Marr Waddoups chose the annuity on his own such that they were excused of any fiduciary duty.

43

In his complaint, Waddoups extends the claim for breach of fiduciary duty to Permann's firm, Financial Management, and to Nationwide. If we read Gary Waddoups' amended complaint broadly, Waddoups alleges that Permann and Financial Management acted as agents of Nationwide when selling the annuity to Marr. Gary Waddoups assigns error to the trial court's grant of summary judgment to all respondents on his breach of fiduciary duty claim. The three respondents filed a joint brief, in which they argue that no breach occurred, but in which Nationwide does not separate itself from the conduct of Permann. Therefore, we proceed on the assumption that Gary Waddoups targets his claim for breach of fiduciary duty against all three respondents.

This court reviews a trial court's order granting summary judgment de novo, performing the same inquiry as the trial court. *Seiber v. Poulsbo Marine Ctr., Inc.*, 136 Wn. App. at 736 (2007). We construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000); *Seiber*, 136 Wn. App. at 736. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). Even if we would rule on the merits in favor of the respondents after an evidentiary hearing, we must deny the summary judgment motion when material issues of fact are present.

We isolate the discrete assertions of Gary Waddoups in order to analyze the cause of action for breach of fiduciary duty. In his brief, Waddoups contends Permann held a

44

conflict of interest and violated his duty to recommend and sell financial products suitable for his client. Related to this violation of duty was Permann's failure to gather information concerning Marr Waddoups' health and life expectancy and failure to explore with Marr the availability of an annuity with a death benefit. Gary Waddoups does not isolate any claim that Permann sold Marr an annuity with a smaller payout than Marr could have purchased from New York Life. We note that John Olsen's expert testimony supports Gary Waddoups' claim that Clark Permann violated industry standards when selling the Nationwide annuity when the New York Life annuity provided a higher return, when failing to explore with Marr Waddoups a single premium immediate annuity with a death benefit, when failing to warn Marr Waddoups of the lack of a death benefit, and when selling an annuity unsuitable to a man of Marr Waddoups' age and health.

A key to the trial court's decision was a finding that Clark Permann warned Marr Waddoups or Marr knew of the absence of a death benefit. We disagree with this finding and conclude that an issue of fact exists on this proposition. The trial court excluded, as hearsay, the comments allegedly made by Waddoups to Permann about living another ten years or understanding the lack of a death benefit. We have already ruled that Permann's testimony should be ignored at the summary judgment stage, and the trier of fact may later discount the testimony of Permann that he warned Marr Waddoups. Cheryl Miller's testimony bolsters Permann's contention that Marr knew of the lack of a death benefit,

but she did not expressly state Marr knew. We agree with Gary Waddoups that a reasonable trier of fact, based on circumstantial evidence, could conclude that Clark Permann never warned Marr Waddoups or that Marr did not know of the lack of a death benefit. Permann did not confirm in writing that he warned Marr. The annuity application and one of the pages of the annuity contract referenced a beneficiary, a feature suggesting a death benefit. Clark Permann sent statements to Marr Waddoups that listed a cash value for the annuity as if the annuity had such a benefit. Waddoups kept a ledger suggesting he expected death benefits.

We further observe that John Olsen's testimony establishes a violation of the standard of care by selling the annuity regardless of whether Permann warned Waddoups of the lack of a death benefit or regardless of whether Waddoups otherwise knew of the lack of a death benefit. Young attorneys soon learn that one of the hardest tasks of a lawyer is telling a client "no." Nevertheless, sometimes a client must be told not to engage in particular conduct, file a lawsuit, or employ a certain tactic during litigation. The fact that the client may hire substitute counsel to provide the advice desired or to perform the task requested does not excuse the attorney from properly advising or refusing to perform a task. John Olsen's testimony could lead a trier of fact to conclude that Clark Permann violated a financial planner's duty of care by failing to tell Marr Waddoups "no" if and when Waddoups insisted on the Nationwide annuity. Marr Waddoups might have had financial acumen, but Permann, not Waddoups, was the

46

professional.

A jury may find that Marr Waddoups would have purchased an identical annuity from another financial planner if Clark Permann refused to sell the annuity. We consider this factual proposition to be unproven for purposes of defendants' summary judgment motion. The jury could also conclude from the evidence that, if Permann refused to sell the life only annuity or showed Marr Waddoups other options, Waddoups would have purchased a more suitable annuity.

The law of fiduciaries requires reversal of the summary judgment order favoring defendants. In a fiduciary relationship one party occupies such a relation to the other party as to justify the latter in expecting that his interests will be served. *Liebergesell v. Evans*, 93 Wn.2d 881, 889-90, 613 P.2d 1170 (1980); *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 110 Wn. App. 412, 433, 40 P.3d 1206 (2002). A fiduciary relationship arises as a matter of law in certain contexts such as attorney and client, doctor and patient, trustee and beneficiary, principal and agent, and partner and partner. *Micro Enhancement Int'l v. Coopers & Lybrand*, 110 Wn. App. at 433-34. Acting as an advisor may contribute to the establishment of a fiduciary relationship. *Liebergesell v. Evans*, 93 Wn.2d at 889-90. Financial planners owe a fiduciary duty to their customers. *McGraw v. Wachovia Sec., LLC*, 756 F. Supp. 2d 1053, 1078 (N.D. Iowa 2010); *Johnston v. CIGNA Corp.*, 916 P.2d 643, 647 (Colo. App. 1996).

47

Breach of fiduciary duty is merely negligence of a professional. The action is based on tort and duties imposed by reason of a special relationship rather than in contract. *Hudson v. Condon*, 101 Wn. App. 866, 873, 6 P.3d 615 (2000); *GW Constr. Corp. v. Professional Serv. Indus., Inc.*, 70 Wn. App. 360, 364, 853 P.2d 484 (1993). The plaintiff must prove (1) existence of a duty owed, (2) breach of that duty, (3) resulting injury, and (4) causation between the breach and injury. *Miller v. U.S. Bank of Wash.*, 72 Wn. App. 416, 426, 865 P.2d 536 (1994); *Am. Commerce Ins. Co. v. Ensley*, 153 Wn. App. 31, 42, 220 P.3d 215 (2009). Because of the special relationship, the fiduciary holds higher duties beyond ordinary negligence, which duties include acting in the best interest of the client and avoiding conflicts of interest. *Trask v. Butler*, 123 Wn.2d 835, 843, 872 P.2d 1080 (1994); *In re Estate of Larson*, 103 Wn.2d 517, 520, 694 P.2d 1051 (1985); *In re Marriage of Petrie*, 105 Wn. App. 268, 276, 19 P.3d 443 (2001). On its website, Financial Management pledged to work in the best interest of the client.

We conclude that the facts already reviewed create an issue of fact as to all four elements of negligence and breach of fiduciary duty. Facts support findings that Clark Permann violated a duty and the violation caused Marr Waddoups and his estate damage. A reasonable trier of fact could conclude that the Estate of Marr Waddoups lost $51,788 in principal, and perhaps some interest thereon, because of the sale of an unsuitable annuity or that the estate suffered other amounts in damages. The trier of fact, rather than this court, will need to determine whether Clark Permann violated his fiduciary duty, but

48

we observe that one commentator has noted abuses in annuity sales practices targeted against older consumers. Sally Balch Hurme, *Who's In the Batter's Box? Regulating and Litigating Unsuitable Sales of Variable Annuities*, 1 PHOENIX L. REV 365 (2008).

### *Consumer Protection Act*

On appeal, Gary Waddoups abandons his direct claim based on alleged violation of RCW 48.30.010, which bars unfair business practices. He continues to forward his claim under the Consumer Protection Act.

The CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. The purpose of the CPA is to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive and fraudulent acts in order to protect the public. *Rajvir Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009). Courts should liberally construe the CPA to serve its beneficial purposes. RCW 19.86.920. To recover under the CPA, a plaintiff must show (1) an unfair or deceptive act, (2) in trade or commerce, (3) impacting the public interest, and (4) business or property damage, (5) caused by the unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 787-93, 719 P.2d 531 (1986). We address each element in such order.

### *Unfair or Deceptive Act or Practice*

Gary Waddoups contends that Clark Permann's sale of the annuity to Marr Waddoups was deceptive because an unsophisticated consumer would believe that the

annuity contained a death benefit. He also argues that Permann's account statements to Marr Waddoups and Nationwide were deceptive. Respondents respond that the sale of the annuity was not deceptive because Marr Waddoups requested and purchased the annuity, knowing it did not have a death benefit.

Whether an act or practice is unfair or deceptive is a question of law. *Leingang v. Pierce County. Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997). A plaintiff need not show the act in question was intended to deceive, only that the act possessed the capacity to deceive a substantial portion of the public. *Panag*, 166 Wn.2d at 47. A buyer and seller do not deal from equal bargaining positions when the latter has within his knowledge a material fact which, if communicated to the buyer, will render the goods unacceptable or, at least, substantially less desirable. *Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 51, 554 P.2d 349 (1976). Failure to reveal a fact which the seller is in good faith bound to disclose may generally be classified as an unfair or deceptive act due to its inherent capacity to deceive. *Testo v. Russ Dunmire Oldsmobile*, 16 Wn. App. at 51.

A communication may contain accurate information yet be deceptive. *Rajvir Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d at 50 (2009). Deception exists if there is a representation, omission or practice that is likely to mislead a reasonable consumer. *Panag v. Farmers*, 166 Wn.2d at 50. In evaluating the tendency of language to deceive, the court should look not to the most sophisticated readers but rather to the least. *Panag*

50

*v. Farmers*, 166 Wn.2d at 50. A communication may be deceptive by virtue of the "net impression" it conveys, even though it contains truthful information. *Panag v. Farmers*, 166 Wn.2d at 50. Washington courts have held misleading language in contracts and other documents to be an unfair and deceptive act within the meaning of the CPA or at least to create an issue of fact under the CPA. *Panag v. Farmers*, 166 Wn.2d 27 (2009); *Holiday Resort Cmty Ass'n v. Echo Lake Assocs., LLC*, 134 Wn. App. 210, 226-27, 135 P.3d 499 (2006).

We conclude Gary Waddoups presented sufficient evidence to show an issue of fact as to whether Clark Permann's sale of the annuity to Marr Waddoups was unfair or deceptive under the CPA. Examining the facts in the light most favorable to Gary, a reasonable jury could find that the language of the annuity application and contract had the capacity to deceive a substantial portion of the public into believing that the annuity contained a death benefit. A jury could reach this finding because of the presence of a beneficiary designation on the application, the definition of the beneficiary in the contract, the absence of a definition of single life in the application, the reasonable interpretation that the contract's definition of single life could include a principal payout or other form of interest for the beneficiary after the annuitant's death, and Clark Permann's quarterly account reports. Also, a reasonable jury could find that the sale of a life contingent annuity to an eighty-five-year-old male with diabetes and renal failure constitutes an unfair act.

51

*Trade or Commerce*

Gary Waddoups contends that Clark Permann's sale of the annuity to Marr

Waddoups occurred in trade or commerce because it was the sale of an asset or service

affecting the people of the state of Washington. The respondents do not address this

element of the CPA. We agree with Waddoups.

Trade and commerce includes the sale of assets or services and any commerce

directly or indirectly affecting the people of the state of Washington. RCW 19.86.010.

The legislature intended these terms to be construed broadly. *Hangman Ridge*, 105

Wn.2d at 785; *Stephens v. Omni Ins. Co.*, 138 Wn. App. 151, 173, 159 P.3d 10 (2007)

*aff'd sub nom. Rajvir Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 204 P.3d 885

(2009). Many cases note that the sale of insurance and contract performance of an

insurance company falls within the phrase "trade or commerce" for purposes of the CPA.

*Panag v. Farmers*, 166 Wn.2d 27 (2009); *Indus. Indem. Co. of the Nw., Inc. v. Kallevig*,

114 Wn.2d 907, 792 P.2d 520 (1990); *Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw

Ins. Co.*, 150 Wn. App. 1, 206 P.3d 1255 (2009); *Anderson v. State Farm Mut. Ins. Co.*,

101 Wn. App. 323, 2 P.3d 1029 (2000). Although the cases involve postsale activities,

we know of no reason to preclude annuity sales activities from coverage under the CPA.

*Public Interest*

Gary Waddoups contends the sale of the annuity affects the public interest because

Clark Permann violated RCW 48.30.210 and 48.23.470 and because the annuity sale was

52

part of a broader effort to market the sales of annuities to other Washington residents.
Respondents do not address this element of the CPA in their brief.

Under RCW 19.86.093, a private plaintiff must show the unfair or deceptive act
was injurious to the public interest. Plaintiff may establish this element if the act (1)
violates a statute that incorporates the CPA, (2) violates a statute that contains a specific
legislative declaration of public interest impact, or (3) injured other persons, had the
capacity to injure other persons, or has the capacity to injure other persons. RCW
19.86.093. Ordinarily, a breach of a private contract affecting no one but the parties to
the contract is not an act or practice affecting the public interest. *Hangman Ridge
Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d at 790 (1986). Nevertheless,
the likelihood that additional plaintiffs have been or will be injured in exactly the same
fashion changes a factual pattern from a private dispute to one that affects the public
interest. *Hangman Ridge*, 105 Wn.2d at 790. Factors indicating public interest in this
context include: (1) were the alleged acts committed in the course of defendant's
business? (2) Did defendant advertise to the public in general? (3) Did defendant
actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did
plaintiff and defendant occupy unequal bargaining positions? *Hangman Ridge*, 105
Wn.2d at 790-91.

Gary Waddoups creates an issue of fact as to the public interest element of his
CPA claim because the Nationwide annuity application and the annuity contract have the

potential to deceive annuity purchasers. Permann's website promulgated to the public a promise of the reliability of his advice and emphasized his certification and fiduciary responsibility.

## *Causation and Injury*

Gary Waddoups contends that sale of the annuity injured Marr Waddoups' property because he lost $51,788 of the premium paid. Respondents argue the lack of causation of damages in the context of the cause of action for breach of fiduciary duty but not in the context of the CPA cause of action. The analysis we performed for purposes of the fiduciary duty cause of action applies to the CPA claim.

## Attorney Fees

Gary Waddoups requests us to direct the trial court to award him reasonable attorney fees and costs on appeal when he prevails on the merits at trial. Attorney fees are recoverable under the Consumer Protection Act to a successful plaintiff. RCW 19.86.090; *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 856, 792 P.2d 142 (1990). We do not consider this request ripe for review since Waddoups may not prevail at trial.

## CONCLUSION

We reverse the trial court's grant of summary judgment to respondents on Gary Waddoups' causes of action for breach of fiduciary duty and violation of the Consumer Protection Act. We deny, for the present, Gary Waddoups' request for an award of reasonable attorney fees and costs on appeal, but reserve for Waddoups the right to apply

54

No. 33257-8-III
*Waddoups v. Nationwide Life Ins. Co.*

to the trial court for an award if he prevails on his Consumer Protection Act claim at trial.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, C.J.

Korsmo, J.

55